THE O'MARA LAW FIRM, P.C.
DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
775/323-4082 (fax)

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| PROTECT OUR GIRLS, a Committee for Political Action (PAC) Advocating Passage, and MELISSA CLEMENT, an individual, | Case No.   3:20-cv-00515-MMD-WGC |
| Plaintiffs, | |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| BARBARA CEGAVSKE in her official capacity as Nevada Secretary of State, JOSEPH P. GLORIA in his official capacity as Clark County Registrar of Voters, DEANNA SPIKULA in her official capacity as Washoe County Registrar of Voters, KRISTINA JAKEMAN in her official capacity as Elko County Clerk, SADIE SULLIVAN in her official capacity as Lander County Clerk, LACEY DONALDSON in her official capacity as Pershing County Clerk-Treasurer, VANESSA STEVENS in her official capacity as Storey County Clerk-Treasurer, NICHOLE BALDWIN in her official capacity as White Pine County Clerk, SANDRA MERLINO in her official capacity as Nye County Clerk, TAMMI RAE SPERO in her official capacity as Humboldt County Clerk, KATHY LEWIS in her official capacity as Douglas County Clerk-Treasurer, LINDA ROTHERY in her official capacity as Churchill County Clerk-Treasurer, LACINDA ELGAN in her official capacity as Esmeralda County Clerk-Treasurer, LISA C. LLOYD in her official capacity as Lincoln County Clerk, LISA HOEHNA in her official capacity as Eureka County Clerk, CHRISTOPHER NEPPER in his official capacity as Mineral County Clerk-Treasurer, NIKKI BRYAN in her official capacity as Lyon County Clerk-Treasurer, and AUBREY ROWLATT in her official capacity as Carson City Clerk-Recorder, | |
| Defendants. | |

- 1 -

1

2      Plaintiffs Protect Our Girls, a Committee for Political Action (PAC) Advocating Passage,

3  and Melissa Clement, an individual (collectively "Plaintiffs"), by and through their undersigned

4  counsel, respectfully move this Court, pursuant to Federal Rule of Civil Procedure 65 for a

5  Preliminary Injunction enjoining Defendants from requiring Plaintiffs to collect the necessary

6  signatures by the time prescribed in NRS 295.056(2), November 18, 2020, and instead, extending the

7  time to collect the signature and file the Initiative with the Secretary of State no less than 30 days

8  prior to the start of the 2021 Nevada Legislative session.   This Motion is based upon the following

9  Memorandum of Points and Authorities, the Complaint, the Declaration of Melissa Clement and

10 exhibits thereto which is filed concurrently herewith, the pleadings and papers on file herein, and

11 such other evidence and argument as the Court may allow.

12 **I.    INTRODUCTION**

13      This action arises out of Protect Our Girls proposal to amend an existing state law through a

14 Statewide Statutory Initiative Petition, S-04-2020 ("Initiative") that was initiated on March 11, 2020.

15 This initiative will prohibit a physician from knowingly performing an abortion upon a minor unless:

16 (1) a custodial parent or guardian of the minor is notified prior to the abortion ("parental notification

17 requirement"); or (2) upon the petition of the minor, a Nevada court authorizes the abortion without

18 parental notification ("judicial bypass"). Presently, a pregnant minor in the state of Nevada can get

19 an abortion without parental notification or authorization by a court. The Nevada legislature passed a

20 parental notification requirement in 1985, but the law was never enforced because a federal court

21 found that its judicial bypass portion was not written appropriately. This initiative addresses this by

22 rewriting the expedited judicial bypass schedule. It also amends law to enhance the protection of the

23 minor's privacy. The amended law provides that a Nevada court may authorize an abortion for a

24 minor without parental notification if the court finds that the minor is sufficiently mature and capable

25 of giving informed consent to the proposed abortion or that the performance of an abortion on the

26 minor without notification of a custodial parent or guardian would be in the minor's best interests.

27      Since the Initiative was filed, however, the Covid-19 pandemic ("Pandemic") has gripped the

28 State of Nevada and this Country.   In response, all levels of the government have issued social

1   distancing requirements and stay-at-home directives that continue to preclude the interpersonal

2   contact necessary to gather signatures to qualify the Initiative, and other initiatives seeking to be

3   placed before the voters or the Nevada Legislature for action.

4   In recognition of this difficulty, Protect Our Girls requested relief from the Secretary of State

5   (the "Secretary"), Nevada's chief elections officer.  *See* Melissa Clement Declaration in Support of

6   Plaintiff's Motion for Preliminary Injunction "Clement Decl." at Exhibit 1. Protect Our Girls

7   requested that the Secretary extend the deadline for submitting the Initiative for verification

8   (November 18, 2020) six (6) weeks to December 29, 2020.  *Id.* The Secretary refused, indicating she

9   was "unaware of any authority under Nevada law by which the Secretary of State can modify the

10  requirements of NRS 295.056 regarding the petition submission deadline.  Clement Decl. Ex. 2. The

11  Secretary refused notwithstanding the fact that she previously ordered that Nevada's June 9, 2020

12  primary would be conducted by all mail contrary to certain written requirements of Nevada election

13  law.  Additionally, the Secretary refused notwithstanding the fact that she, and every other County

14  Election Office, entered a Consent Decree allowing an extension of the deadline to submit an

15  initiative for verification on June 9, 2020, some eighty-eight (88) days before rejecting Protect Our

16  Girls request. Clement Decl. Ex. 3, *see also See Fair Maps Nevada v. Cegavske*, Case No. 3:2020-

17  cv-00271 (ECF 48).

18  Additionally, this Court recently held that such action was valid under the Secretary's

19  authority pursuant to NRS 293.247(4), which provides that the Secretary may, in connection her

20  duties as chief election offer, "provide interpretations and take other actions necessary for the

21  effective administration of the statutes and regulations governing the conduct of primary, general,

22  special and district elections in this State."  *Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC,

23  2020 WL 2089813, at *8-10 (D. Nev. Apr. 30, 2020).  Unfortunately, the Secretary has chosen to set

24  forth two different interpretations of the signature gathering requirements as if the stay-at-home

25  directives "had no impact on the rights of candidates and the people who may wish to vote for them"

26  when it comes to the issue presented by the Fair Maps initiative and the Protect Our Girls initiative

27  pending before this Court.  *See e.g. Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 WL

28  1910154, at *1 (E.D. Mich. Apr. 20, 2020) (extending deadline to accept signatures).

1    In light of the Secretary's action, this Court should take immediate action to preserve
2    Plaintiffs' constitutionally protected rights to circulate the Initiative, have it delivered to the Nevada
3    Legislature for action, and then vote on the same.  Otherwise, the Secretary's interpretation and
4    application of NRS 295.056(2) will unduly burden Plaintiffs' constitutionally protected rights

5    **II.    STATEMENT OF FACTS**

6       **A.    The Initiative**

7    On March 11, 2020, Plaintiff filed Statutory Initiative Petition S0-04-2020 pursuant to
8    Article 19, Section 2(3) of the Nevada Constitution.  If the Initiative obtains the necessary
9    signatures, it will be sent to the Nevada Legislature for action, and/or if necessary, placed on the
10   ballot so voters can determine whether to amend Nevada law.

11   On March 12, 2020, the Secretary of State confirmed the Initiative filing and advised that the
12   "deadline to challenge single subject, description of effect and matters relating thereto for this
13   petition is April 1, 2020."  No challenge was filed. In order to qualify the Initiative to be sent to the
14   2021 Nevada Legislature, and then, if necessary, placed on the ballot,  the Initiative must obtain the
15   signatures of registered voters that equal at least ten percent (10%) of the voters who voted at the last
16   preceding General Election.  Only registered voters of the county and petition district where the
17   petition is circulated may sign the petition.  Under Nevada law, Protect Our Girls have until
18   November 18, 2020, to submit the necessary signatures to the counties for verification.

19      **B.    The Pandemic**

20   The COVID-19 pandemic ("Pandemic") has resulted in the near total cessation of public
21   activity in Nevada.  This necessary public health action is the result of the adoption of guidance by
22   the federal government and adherence to legal directives issue by the Governor of the State of
23   Nevada.  On January 30, 2020, the World Health Organization declared that the novel coronavirus
24   (COVID-19) constitutes a Public Health Emergency of International Concern.  (Clement Decl., Ex.
25   4).  On January 31, 2020, President Donald Trump suspended entry into the United States by all
26   foreign nationals who had traveled to China in the past 14 days.  *Id.* at Ex. 5.  On February24, 2020,
27   President Trump asked Congress to allocate $2.5 billion for a COVID-19 response.  (*Id.*, Ex. 6.)

28

1        On February 25, 2020, the Director of the National Center for Immunization and Respiratory

2    Diseases at the Centers for Disease Control and Prevention ("CDC") announced that "[d]isruption to

3    everyday life may be severe" as a result of the virus.  *Id.* at Ex. 7.  Regarding the spread, the Director

4    stated that "[i]t's not so much a question of if this will happen anymore but rather more of a question

5    exactly when this will happen," and called upon the American public to "work with us to prepare."

6    *Id*.  On February 26, 2020, CDC officials stated that "[n]on-pharmaceutical interventions or NPIs

7    will be the most important tools in our response to this virus," and that such NPIs included "social

8    distancing measures." *Id.* at Ex. 8.  On February 27, 2020, the CDC issued further guidance

9    recommending that affected local communities practice "social distancing" measures, including

10   reducing the frequency of large gatherings and limiting the number of attendees.  *Id.* at Ex. 9.  On

11   March 13, 2020, the President declared a national state of emergency regarding COVID-19.  *Id.* at

12   Ex. 10.

13       On March 16, the President recommended broad social distancing guidelines for all

14   Americans to "slow the spread" of COVID-19.  (*Id.*, Ex. 11.)  The guidance was initially for a

15   fifteen-day effective period.  (*Id.*)  On April 2, 2020, President Trump extended the for thirty-days.

16   (*Id.*, Ex. 12.)  The CDC also issued guidance requesting that Americans engage in social distancing,

17   including, but not limited to, maintaining a distance of six feet between persons.  (*Id.*, Ex. 13.)

18       President Trump's social distancing guidelines focus on reducing interpersonal contact of all

19   Americans. His guidelines recommend the following actions, among others:

20   - Listen to and follow the direction of your **STATE AND LOCAL AUTHORITIES**

21   - **IF YOU FEEL SICK,** stay home. Do not go to work. Contact your medical
22     provider.

23   - **IF SOMEONE IN YOUR HOUSEHOLD HAS TESTED POSITIVE** for the
24     Coronavirus, keep the entire household at home. Do not go to work. Do not go to
25     school. Contact your medical provider.

26   - **IF YOU ARE AN OLDER PERSON**, stay at home and away from other people.

27

28

- **IF YOU ARE A PERSON WITH A SERIOUS UNDERLYING HEALTH CONDITION** that can put you at increased risk…, stay home and away from other people. (*Id.* Ex 12 at 1)

The President's guidance includes direction specifically for people that are healthy:

- Work or engage in schooling **FROM HOME** wherever possible.
- **AVOID SOCIAL GATHERINGS** in groups of 10 or more people
- Avoid eating and drinking at bars, restaurants, and food courts—**USE DRIVE-THRU, PICKUP, OR DELIVERY OPTIONS**. (*Id.* Ex 12 at 2)

On March 12, 2020 Governor Sisolak issued a Declaration of Emergency to facilitate the State's response to the Pandemic. (*Id.*, Ex. 14.) Since issuing the Declaration of Emergency, Governor Sisolak has issued several legal directives consistent with the President's guidelines and the CDC's recommendations drastically limiting interpersonal contact in Nevada.

On March 31, 2020, Governor Sisolak issued a "stay at home" order. (*Id.*, Ex. 15.) In that order, Emergency Directive 010, the Governor extended his March 12 Declaration of Emergency through April 30, 2020. (*Id.*, Ex. 15 § 1.) He further ordered all Nevadans to stay in their home and not gather socially, subject to certain limited exceptions. (*Id.*, Ex 15 § 2.)

Although Emergency Directive 010 "does not prohibit individuals from engaging in outdoor activity, including without limitation, activities such as hiking, walking, or running," individuals engaging in that activity must comply with Emergency Directive 007, maintain at least 6 feet distancing from other individuals, and not congregate in groups beyond their household members. (*Id.*, Ex. 15 § 6.) The Governor issued Emergency Directive 007 on March 24, 2020. (*Id.*, Ex. 16.) That order imposes certain social distancing requirements on Nevadans. (*Id.*) Specifically, it provides that, with the exception of persons residing in the same household, Nevadans must "to the extent practicable, abide by social distancing practices by maintaining a minimum six-foot distance between persons in public spaces, whether privately or publicly owned." (*Id.*, Ex. 16 § 2.) It also requires that local governments limit Nevadans use of recreational spaces. (*Id.*, Ex. 16 § 3.) Individuals that violate the social distancing restrictions in the order are subject to criminal and civil penalties. (*Id.*, Ex. 16 §§ 5-6.)

1    In addition to the restrictions identified above, Governor Sisolak closed non-essential

2 business, including many retail establishments.  (*Id.*, Ex. 17 §§ 1-3.)  Governor Sisolak also ordered

3 the closure of state buildings.  (*Id.*, Ex. 18 at 2.)  Local governments have taken similar action and

4 agreed to use their enforcement authority to enforce the Governor's directives.  (*Id.*, Ex. 19.)  On

5 April 29, 2020, Governor Sisolak extended his stay at home order through May 15, 2020.  (*Id.*, Ex.

6 20 § 8.)    Only recently, did Governor Sisolak allow for gatherings, outside of casinos and

7 restaurants, where more than fifty (50) people could attend, and that number was set at 10% crowd

8 capacity or two hundred fifty (250) people.

9    C.    **Signature gathering during the Pandemic**

10    The Governor's actions make it extremely difficult to collect signatures to qualify the

11 Initiative for the ballot in a traditional in-person manner.  (Clement Decl. ¶¶ 7-14.)

12    Under normal circumstances, signatures are gathered using a variety of methods, all of which

13 require interpersonal contact inconsistent with the mandated social distancing that continues to

14 remain in effect, as directed by the Governor.  (*Id.* ¶¶ 9-10.)  Eligible voters are contacted door-to-

15 door at their homes, in front of retail establishments, restaurants and entertainment venues, or in or

16 around government buildings to solicit their interest in signing a petition.  (*Id.* ¶ 10.)  If, after a brief

17 conversation, an individual is interested in signing the petition, the person signs the same piece of

18 paper—most likely using the same pen—that others have signed.  (*Id.*)

19    However, in the current environment, traditional signature gathering is extremely difficult,

20 and it is implausible that Protect Our Girls will meet NRS 295.056(2)'s submission deadline.  (*Id.* ¶¶

21 8, 17.)  Nevadans were ordered to stay at home almost immediately after Protect Our Girls file the

22 Initiative with the Secretary of State.  (*Id.* ¶ 12; Ex. 15.)  Most local government buildings remain

23 closed for a long period of time and continue to have restrictions on access.  (Compl., Ex. 18 and

24 19.)  Restaurants, bars and entertainments venues were all closed for in-person dinning, drinking and

25 enjoyment.  (Clement Decl. ¶ 12; Ex. 17 §§ 1-3.)  Many retail establishments were closed and are

26 now providing curbside pick-up so to limit exposure and contact with others.  (*Id.* at Ex. 17 §§ 1-3.)

27 Public events were canceled and continue to be cancelled *en masse*.  (Clement Decl. ¶ 12.)  The

28 directives at the beginning of this Pandemic even prohibited people from gathering in parks in

1 substantial number and individuals are still directed, to the extent practicable, to a six-foot social

2 distancing limitation.  (*Id*. at Ex. 13 § 6, Ex. 14 § 3.)

3        It is extremely challenging to gather physical ink signatures on hard copy documents in the

4 time allotted as is traditionally done to qualify an initiative petition for the ballot.  (*See* Clement

5 Decl. ¶¶  8-16.)  Because of the Governor's directives, there are less people attending church, less

6 people going to public and government buildings, and less people attending political events, where

7 signature gathering has been traditionally accomplished.

8        D.      **Nevada and other states have taken action to protect political speech in light of**

9              **COVID-19**

10        On March 24, 2020, the Secretary announced that Nevada would conduct its June 9, 2020

11 primary election by all mail out of concerns for the health and safety of voters and poll workers

12 related to the Pandemic.  In doing so, the Secretary authorized all Nevada voters to vote by absentee

13 ballot and required that all registered voters in Nevada be mailed an absentee ballot.  No voter will

14 be required to request an absentee ballot to receive one.  However, the Secretary also ordered that

15 one polling place in each county be available to voters accommodate same-day voter registration, as

16 well as assist voters who have issues with the ballot that was mailed to them.

17        56.     In mandating that the primary be conducted by all mail, the Secretary did so despite

18 the fact that an all-mail primary conflicts with certain elements of Nevada law, including NRS

19 293.272, which requires that most Nevadans who register to vote by mail or computer must, for the

20 first election in which the person votes at which that registration is valid, vote in person unless he or

21 she has previously voted in the county in which he or she is registered to vote.  NRS 293.272(1).

22        57.     In addition to taking precautions to safeguard the primary election, the Secretary has

23 suspended in-person transactions at her office and is accepting all election filings electronically.

24        58.     The Governor called a special session of the Nevada Legislature which passed new

25 legislation allowing the general election to be conducted by all mail-in ballots.  The 2020 election

26 will not be conducted by mail-in ballots, with the opportunity to vote in person during early voting

27 and on election day.

28

59.    Other jurisdictions in the United States have responded to the Pandemic by changing election processes and rules for elections and initiatives to accommodate political speech in the midst of the Pandemic.

60.    Ohio postponed their 2020 primary election until April 28, 2020.  Ohio conducted the election almost exclusively by mail and voting centers only opened for people with disabilities to vote in person.

61.    On March 25, 2020, a Virginia state court granted a preliminary injunction and ordered a reduction in the number of signatures needed for candidates to enter Virginia's primary election from 10,000 to 3,000. The court found that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," and that the regulations requiring the signatures were not narrowly tailored because they "do[ ] not provide for emergency circumstances, like those that currently exist." *Faulkner v. Va. Dep't of Elections*, No. CL 20-1456, slip op. at 3 (Va. Cir. Ct. Mar. 25, 2020)

62.    On April 17, 2020, the Massachusetts Supreme Judicial Court, Massachusetts' highest court, ordered three forms of relief for candidates seeking access to the ballot: first a reduction in the signature requirements by 50%, second an extension of the deadlines for filing of signatures, and third, a requirement that the Secretary of State accept electronic rather than wet-ink original signatures.  The court agreed with petitioners that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to seek elective office." *Goldstein v. Sec'y of Commonwealth*, 142 N.E.3d 560, 564 (Mass. 2020)

On April 20, 2020, a federal court in Michigan granted a motion for preliminary injunction reducing the state signature requirement for a candidate to Michigan's Eleventh Congressional District after finding that "the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements operate in tandem to impose a severe burden" on the Plaintiff. *Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020)

1        On June 8, 2020, the Secretary of State, and other county election officials, filed a Joint

2 Motion with *Fair Mapes* to enter a Consent Decree.  The Court approved the Consent Decree on

3 June 9, 2020. *See Fair Maps Nevada v. Cegavske*, Case No. 3:2020-cv-00271 (ECF 48).

4        Additionally, after filing this pending action, the Secretary and all the County Election

5 Officials entered into a Consent Decree and filed a joint motion for Court approval.

6        E.     **Nevada Secretary of State and the Initiative**

7        On August 18, 2020 Protect Our Girls contacted the Secretary and made a request to

8 extend the time period to submit the Initiative for Verification.  Clement Decl. Ex. 1.  Protect

9 Our Girls requested that the Secretary extend the deadline for submission of the Initiative for

10 verification by at least six weeks.  *Id.*  By letter dated September 4, 2020, the Secretary denied

11 Plaintiff's requests.  *Id. at* Ex. 2.  Thereafter, on Protect Our Girls file the pending litigation

12 against the Secretary of State and all of Nevada's county election officials. On Monday

13 September 14, 2020, Protect Our Girls counsel sent the Attorney General's office an email

14 asking if counsel would be involved in this matter.  In response, counsel for the Secretary of

15 State responded that he would accept service and he suspected "that we can agree to a proposed

16 consent decree and file a joint motion with the court."  A consent decree was ultimately agreed

17 upon by the SOS and the County Election Officials and a Joint Motion was submitted to the

18 Court for approval.

19 **III.**     **LEGAL STANDARD**

20        Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions.  Fed. R.

21 Civ. P. 65.  To qualify for a preliminary injunction, a plaintiff must satisfy four requirements: "(1) a

22 likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of

23 equities favors the plaintiff; and (4) that the injunction is in the public interest."  *Paher*, 2020 WL

24 2089831, at *4. "A plaintiff may also satisfy the first and third prongs by showing serious questions

25 going to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor." *Id.*

26 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

27

28

**IV.   ARGUMENT**

As articulated below, Plaintiffs have met their burden with respect to these factors and therefore a preliminary injunction should issue.

> **A.   Plaintiffs are entitled to a preliminary injunction because Plaintiffs will suffer irreparable harm if their constitutional rights are infringed.**

Precluding the delivery of the Initiative to the 2021 Nevada Legislature, and thereafter, if necessary, placing it on ballot for the next general election will unconstitutionally infringe Plaintiffs' right to engage in political speech by circulating and, in the case of individual voters, voting to amend existing state law. This infringement constitutes irreparable injury for which the issuance of a preliminary junction is appropriate. *See Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) (citing *Cardona v. Oakland Unified Sch. Dist., Cal.,* 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.")). In the cases of impairment of constitutional rights, courts have regularly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)); *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). The Ninth Circuit has held that the harm is "particularly irreparable where . . . a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'" *Klein*, 584 F.3d at 1208 (second alteration in original) (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008), amended and superseded, 574 F.3d 1011 (2009)). Here, COVID-19 and the related social distancing measures imposed by federal, state and local governments make it highly unlikely that Protect Our Girls will be able to satisfy Nevada's statutory requirements for qualifying the Initiative to be delivered to the 2021 Nevada Legislature, and if necessary, placed on the next general election ballot. As Melissa Clement states in her declaration, during the beginning of the Pandemic, and to an extent today, it was, and is not feasible to gather ink signatures on a petition circulated by hand in an environment where interpersonal contact is generally advised against and in many cases prohibited. (Clement Decl. ¶¶ 8-16.) Any attempt to gather signatures would subject petition

1    circulators and the general public to a higher health risk and expose circulators to possible

2    government fines.

3       Additionally, as shown in the *Fair Maps* litigation, voters were particularly likely in the

4    current environment to avoid petition circulators during the beginning of this Pandemic, and such

5    reluctance is still found today as Protect Our Girls seeks to obtain signatures. *See* Clement Decl.

6    ¶15. This is especially true for those at heightened risk for COVID-19 complications. *See* Clement

7    Decl. Ex. 21.

8       The difficulty of gathering the requisite signatures during the early stages of the Pandemic

9    and the environment Nevadans find themselves today is exacerbated by the fact that there is no clear

10   indication when the social distancing mandates will be lifted—to say nothing of when Nevadans will

11   feel comfortable leaving their homes and engaging with signature gatherers. The Governor has

12   extended his own stay-at-home order twice already, and current directives sill impose serious

13   restrictions of large gatherings within the State. Consequently, it is unlikely that social distancing

14   will be eased in time for Plaintiffs to qualify the Initiative to be sent to the Nevada Legislature in the

15   traditional manner by November 18, 2020. Clement Decl. 16-17.

16      In light of these facts, requiring Protect Our Girls to gather the necessary signatures by

17   November 18, 2020 is implausible. The Secretary of State, and all the Nevada County Officials

18   therefor have agreed to extend the time until December 29, 2020 and entered into a Consent Decree

19   with Plaintiffs setting forth this new deadline date.

20      Therefore, as a constitutionally protected activity, the State's election official's change in

21   position and now present refusal to extend the time as it did in the *Fair Maps* litigation, and

22   previously agreed pursuant to a consent decree in this matter, will therefore cause irreparable harm.

23   There is no remedy available to give effect to these rights or compensate Plaintiffs for their loss. An

24   injunction preventing the harm from occurring is the only suitable remedy.

25        **B. Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their claims.**

26

27      Plaintiffs have a likelihood of success on at least one, if not all, of their claims against

28   Defendants. Plaintiffs allege six (6) claims. ECF 1 ¶¶ There are six claims relating to the

1    constitutionality of the Secretary's failure to extend the deadline for submitting the Initiative for

2    verification no later than November 18, 2020.  *Id.*

3         Plaintiffs' constitutional claims allege that the Secretary's actions violate their right to

4    engage in political speech by preventing them from circulating and qualifying the Initiative for

5    delivery to the Nevada Legislature and further prevents them from voting on the Initiative in the

6    during the first general election should the Nevada Legislature not amend the statute.  Plaintiffs

7    claim that these actions violate the First and Fourteenth Amendments to the U.S. Constitution and

8    various provisions of the Nevada Constitution, including Article 9, Section 1 (right to speech),

9    Article 19, Section 2(1) (right to circulate an initiative petition), and Article 2, Section 1 (right to

10   vote).  (*Id.*)

11        Federal courts evaluating challenges to laws that regulate the election process apply the

12   framework from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428

13   (1992).  Under *Burdick's* balancing and means-end fit framework, strict scrutiny is applied when the

14   First or Fourteenth Amendment rights are subject to "'severe' restrictions." *Pub. Integrity All., Inc.*

15   *v. City of Tucson,* 836 F.3d 1019, 1024 (9th Cir. 2016) (quoting Burdick, 504 U.S. at 434).

16   However, "when a state election law provision imposes only 'reasonable, nondiscriminatory

17   restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important

18   regulatory interests are generally sufficient to justify' the restrictions." *Id.*

19             i.    **The challenged requirements impose a severe burden on the Plaintiffs'**
                    **constitutional rights.**

20

21        The challenged requirements impose a severe burden on Plaintiffs' First Amendment Rights

22   by impeding their ability earn a place on the ballot.  Indeed, the challenged requirements prevent

23   Plaintiffs and other Nevada voters from voting on the Initiative during the 2022 general election.

24   These restrictions are undoubtedly severe and therefore strict scrutiny applies to the challenged

25   restrictions. *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).  The United States Supreme Court

26   has held that the circulation of ballot petitions is "core political speech" where First Amendment

27   protection is at its "zenith."  *Meyer v. Grant*, 486 U.S. 414, 421-422, 425 (1988).  The Nevada

28   Supreme Court has clarified that Nevadans' right to engage in political speech as articulated by the

1   Nevada Constitution, including the right to circulate a ballot petition, is subject to First Amendment

2   analysis.  *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev.

3   2004) (concluding that the protections afforded by Article 1, Section 9 and Article 19, Section 2 are

4   subject to First Amendment analysis).

5          In light of the restrictions imposed by the government in response to the Pandemic, requiring

6   that the Initiative be submitted for verification no later than November 18, 2020 cannot withstand

7   strict scrutiny.

8          As Melissa Clement points out in her declaration, in the current environment traditional

9   signature gathering is extremely difficult and it is implausible that Plaintiff will meet NRS

10  295.056(2)'s submission deadline. (Clement Decl. ¶¶ 8-16.)  Nevadans have been ordered to stay at

11  home, and most government buildings are closed.  *Id.* at 18. Restaurants, bars and entertainments

12  venues are closed, with major events being cancelled.  Clement Decl. ¶ 12, Ex. 17.  Many retail

13  establishments are closed.  *Id*. Ex. 17.  Public events have been canceled en masse.  Id. at. ¶ 12.

14  These are all places Protect Our Girls had intended to send circulators.  *Id.* ¶ 23.

15         What's more, individuals must adhere to the extent practicable to a six-foot social distancing

16  limitation and wear some type of mask over their mouth.  *Id*. at Ex. 14.  Thus, as Melissa Clement

17  points out, even if he wanted to circulate the Initiative, it would be practically impossible to do so

18  without breaching the six-foot social distancing limit and having to communicate with the restriction

19  of having to wear a face covering.  *Id.*

20         Even if the Initiative could somehow be circulated at a distance, voters would be reticent to

21  sign.  As Robert MacDonald stated in the Fair Maps action, he wants to sign the Initiative but cannot

22  do so because he is strictly adhering to social distancing protocols.  Clement Decl. Ex. 21.[1]

23         The combination of the closure of public spaces, the prohibition on public gatherings, and the

24  requirement to maintain social distancing makes it highly unlikely Protect Our Girls will qualify the

25

26  [1] The fact that Mr. McDonald may not be willing to sign this Initiative is immaterial, but what is
27  important is that gathering signatures for any other initiatives has been difficult, if not impossible,
    because of the circumstances the Nevada voters find themselves today.

28

1    Initiative for the ballot.  Complicating matters is the fact that, as explained above, it is not clear when

2    these restrictions will be lifted since the Governor's directive has only recently allowed for an

3    increase in outside public gatherings.  Even if the social distancing restrictions were eased today, it is

4    unlikely Plaintiffs would have a reasonable opportunity to qualify the Initiative for the ballot.

5         Consequently, voters like Melissa Clement who has already signed the Initiative and want to

6    vote on it if it is placed on the 2020 general election ballot will not be able to do so.

7              ii.    **The State's interest in preventing fraud and ensuring the Initiative is
               properly verified does not justify the burden imposed by the challenged**

8              **restrictions.**

9         There is no government interest that justifies the near-total abridgment of Plaintiffs'

10   constitutional rights in this election cycle.

11                   a.    **The verification deadline**

12        As to the State's interest in ensuring that the Initiative is properly verified, that interest too

13   can be satisfied through a means that does not prevent Plaintiffs from exercising their constitutional

14   rights.  Submitting the Initiative for verification on December 29, 2020 will afford the county clerks

15   thirty-five (35) days to verify the Initiative and allow a challenged to be filed and heard by the

16   Courts.  *See* NRS 295.061(2).  The Secretary of State and Nevada's election officials have already

17   consented that there will be enough time for this process to take place and still be able to present this

18   Initiative to the 2021 Nevada Legislature.  In fact, the Nevada Constitution contemplated that the

19   Initiative could be filed with the Secretary of State no later than 30 days before the Legislative

20   session which would be January 2, 2021.  Allowing Plaintiffs additional time to secure the requisite

21   signatures will not prevent the county clerks from having the time they need to verify the Initiative,

22   nor does it preclude any challenger from filing a challenge with the Court.  This entire process can

23   be accomplished in less than the time allotted in the Nevada Constitution.

24              iii.   **Other courts that have considered the impact of COVID-19 have taken
               action similar to what Plaintiffs request here.**

25        In *Esshaki v. Whitmer*, the District Court for the Eastern District of Michigan enjoined

26   several of Michigan's requirements for signature gathering for candidate ballot access as severe

27   burdens unsupported by a compelling state interest in light of the COVID-19 pandemic.  In doing so,

28

1    the court stated that the State's social distancing order "ha[ve] pulled the rug out from under

2    [candidates'] ability to collect signatures," have "shuttered" the locations and events at which

3    signatures are normally gathered, leave only "prohibitively expensive" means to obtain signatures.

4    *Esshaki*, 2020 WL 1910154, at *6.  The court stated further that "[a]bsent relief, Plaintiff[ ] lack[s] a

5    viable, alternative means to procure the signatures he needs" and thus "he faces virtual exclusion

6    from the ballot." *Id.*

7         The court then addressed COVID-19 specifically, noting that it "ha[d] little trouble

8    concluding that the unprecedented—though understandably necessary—restrictions on daily life . . .

9    when combined with the ballot access requirements . . . have created a severe burden on Plaintiff's

10   exercise of his free speech and free association rights under the First Amendment, as well as his due

11   process and equal protection rights under the Fourteenth Amendment—as expressed in his effort to

12   place his name on the ballot for elective office." *Id.* (footnote omitted).

13        The court also rejected the State's argument that its interest in ensuring that candidates have

14   sufficient support to qualify for the ballot justified the signature requirement at issue.  The court

15   concluded that the social distancing restrictions dictated by COVID-19 "effectively halted signature-

16   gathering by traditional means, reducing the available time prescribed by the Michigan Legislature

17   to gather one thousand signatures by twenty-nine days." *Id.* at *7. The remedy ordered by the court

18   was to "reduce the signature requirement to account for the lost twenty-nine days." *Id.*  The court

19   entered an injunction that (1) reduced by half the number of signatures required for ballot access, (2)

20   extended the deadline to submit signatures, and (3) required the state to implement a "user-friendly"

21   system to "permit signatures to be gathered through the use of electronic mail" and to permit the

22   signature to be "appropriately witnessed . . . through digital means."  *Id.* at *10.

23        The *Esshaki* court is not the only one to take such action.  In *Faulkner*, a Virginia state court

24   entered an injunction reducing the signature requirement for candidates to qualify for the ballot in

25   light of COVID-19, concluding that Virginia's signature requirement as applied to the plaintiff-

26   candidate infringed on his First Amendment rights.  *Faulkner*, slip op. at 2-4 (attached as Ex. 24 to

27   the Complaint).

28

1        In *Democratic National Comittee v. Bostelmann,* the District Court for the Western District

2    of Wisconsin extended the deadline to request absentee ballot, the deadline to postmark absentee

3    ballot to election day, and deadline for absentee ballots to be received to six days after election, in

4    light of severe burdens caused by COVID-19 and the undue burden otherwise applicable statutory

5    requirements worked on the plaintiffs' constitutional rights.  No. 20-cv-249-wmc, 2020 WL 1638374

6    at *22 (W.D. Wis. Apr. 2, 2020).

7        This Court should reach the same conclusion that it reach in the Fair Maps case as well as

8    what other courts have reached. The unprecedented restrictions on social interaction dictated by

9    COVID-19 and related government guidance and prohibitions makes the State's action to prevent

10   Plaintiffs from exercising their constitutional rights untenable and unconstitutional.

11            C.    **Plaintiffs are entitled to a preliminary injunction because the balance of
                    equities and public interest favor Plaintiffs.**

12

13        Where the government is a party, the Court must consider the balance of equities and public

     interest in relation to the issuance of a preliminary injunction together.  *Drakes Bay Oyster Co. v.*
14
     *Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In
15
     doing so, the Court must "balance the interests of all parties and weigh the damage to each."
16
     *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).
17
          In this case, the balance of equities and the public interest demand that a preliminary
18
     injunction issue.  In the absence of action by this Court, Plaintiffs' constitutional rights will be
19
     abridged, irreparably harming Plaintiffs who will have no reasonable recourse in the absence of
20
     injunctive relief.  The harm caused will damage not only Plaintiffs' constitutional rights but also the
21
     integrity of Nevada's political process to the detriment of all Nevadans.  In light of the fact that the
22
     interest of the State at stake can be satisfied through less restrictive means, there is no reason not to
23
     grant the relief requested.  *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("[T]he
24
     loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes
25
     irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Warsoldier v. Woodford*,
26
     418 F.3d 989, 1001 (9th Cir. 2005) (recognizing that a "colorable First Amendment claim" is
27
     "irreparable injury sufficient to merit the grant of relief").
28

- 17 -

1   While the State may have an interest in the orderly conduct of elections and of preventing

2   ballots from being crowded with non-serious initiatives, these interests are not undermined by the

3   relief sought by Plaintiffs.

4   **V.      CONCLUSION**

5   In light of the foregoing, the Court should grant Plaintiffs' request for a preliminary

6   injunction on an expedited basis.  COVID-19 and social distancing restrictions make it highly

7   unlikely Plaintiffs will be able to exercise their constitutional rights to engage in political speech,

8   place the Initiative before the Nevada Legislature and then on the ballot, and vote on measures of

9   their choices.  Consequently, the Secretary's interpretation of NRS Chapter 295 in the current

10  climate and the Secretary's failure to authorize an extension of time as it did in the Fair Maps action

11  is an unconstitutional violation of Plaintiffs' rights.  This Court must take action to preserve those

12  rights and prevent Plaintiffs from suffering irreparable harm.

13  DATED:  October 20, 2020                    THE O'MARA LAW FIRM, P.C.

14

15                                                              /s/ David C. O'Mara, Esq.
                                                         DAVID C. O'MARA, ESQ.
16
                                                         311 E. Liberty Street
17                                                       Reno, NV 89501
                                                         Tel: 775.323.1321
18                                                       Fax: 775.323.4082

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2    I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

3 foregoing document was filed electronically *via* the Court's ECF system which provided notification

4 of such filing to counsel of record for all parties.

5 Dated: October 20, 2020          /s/ Bryan Snyder

                        BRYAN SNYDER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28